UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JANICE TUDOR,

                Plaintiff,

        -against-

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------------------------------------X
FEUERSTEIN, J.

**ORDER**
**12-CV-2795(SJF)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ AUG 2 1 2013 ★

**LONG ISLAND OFFICE**

Janice Tudor ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of the final determination of defendant Commissioner of Social Security

("Commissioner") that she is not eligible to receive disability insurance ("DI") benefits under the

Social Security Act ("the Act"). The parties now cross-move for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below,

the Commissioner's motion is granted and plaintiff's motion is denied.


# I.   BACKGROUND

## A.   Administrative Proceedings

Plaintiff is a fifty (50) year old female. (Transcript [Tr.] 37, 56, 96). On August 30,

2010, plaintiff filed an application for DI benefits, (Tr. 67), alleging that she could no longer

work as of December 31, 2009 due to her physical ailments, including a right knee tear of the

lateral meniscus, right knee synovitis, right C5 radiculopathy, and broad-based C5-C6 disc

herniation. (Tr. 67, 113-16). On November 18, 2010, the Social Security Administration

1

("SSA") denied plaintiff's claims for DI on the basis that her condition was "not severe enough to keep [her] from working." (Tr. 59-62).

By decision dated September 15, 2011, (Tr. 19-24), following a hearing at which plaintiff appeared, testified and was represented by counsel, the ALJ concluded that plaintiff was "not disabled under sections 216(i) and 223(d) of the Social Securities Act." (Tr. 24). The ALJ found, *inter alia*: (1) that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013, (Tr. 21); (2) that plaintiff has not engaged in substantial gainful activity since December 31, 2009, the alleged onset date, (Tr. 21); (3) that plaintiff has the following severe impairments: disk disease of the lumbar spine and cervical spine, status post arthroscopy of the right knee, and left shoulder disorder status post arthroscopy, (Tr. 21); (4) that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (Tr. 21); (5) that plaintiff has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), (Tr. 21); (6) that plaintiff is capable of performing her past relevant work as a bookkeeper, (Tr. 23); and (7) that plaintiff "has not been under a disability, as defined in the Social Security Act, from the onset date to the date of this decision." (Tr. 24).

Plaintiff filed a timely appeal of the ALJ's decision with the Social Security Appeals Council. (Tr. 14-15). On May 11, 2012, the ALJ's ruling became the final decision of the Commissioner after the Appeals Council denied plaintiff's request for review. (Tr. 1-6). Thereafter, plaintiff commenced this action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

## B. Medical Records

### 1. During the Relevant Period[1]

On December 31, 2009, plaintiff was admitted to the emergency room at Franklin Hospital complaining of generalized pain following a motor vehicle accident. (Tr. 38-40, 169). Plaintiff was diagnosed with a neck and back sprain; was prescribed Advil for the pain; and was discharged from the hospital the same day. (Tr. 39, 171).

On January 5, 2010, Philip Abessinio, D.C. ("Dr. Abessinio"), of Hillside Chiropractic Associates, P.C., examined plaintiff based on complaints of neck pain; neck stiffness; pain in the right shoulder radiating into the arm; middle and lower back pain, radiating into the legs; and bilateral knee pain, greater in the right knee. (Tr. 206). Upon physical examination, plaintiff had decreased range of motion in her spine and knees and increased right knee medial pain; static palpation demonstrated increased right sided occiput, cervical and lumber tone, complicated by active trigger points; motion palpation demonstrated vertebral fixation at C1, C2, C7, T2, T3 and L5; deep tendon reflexes were "Right Biceps (+1), Right Triceps (+1) and Right Patellar (+1);" a chiropractic analysis demonstrated a low right occiput, high right shoulder and a right ilium with a one half inch (1/2") right leg deficiency, indicative of acute post traumatic paraspinal myositic activity; and the following orthopedic tests were positive: Jacksons, Kemps, Foraminal Compression, Laseques, Soto Hall and Vara-Valga stress tests. (Tr. 206). Dr. Abessinio diagnosed plaintiff with cerviobrachial syndrome; suspected right shoulder internal derangement; suspected cervical disc displacement/herniation complicated by radiculopathy/radiculitis;

---

[1] The relevant period is from December 31, 2009, the date on which plaintiff became unable to work, through December 31, 2013, the date that plaintiff was last insured for DI benefits. (Tr. 113).

subscapular neuritis; intervertebral disc syndrome; suspected lumbar disc displacement/herniation complicated by radiculopathy/radiculitis; and suspected bilateral internal derangement. (Tr. 207). Dr. Abessinio's prognosis was: "At this time, [plaintiff] is totally disabled. Her condition is non-stationary." (Tr. 207). Dr. Abessinio recommended weekly chiropractic treatment, a neurological evaluation and an orthopedic evaluation. (Tr. 207).

X-rays of plaintiff's cervical, thoracic and lumbar spine taken on January 5, 2010 revealed: "[r]eversal of the normal cervical lordosis;" rotation malposition at C3, C4, C6 and C7 left; "decreased disc spacing at the C5-C6 level complicated by vertebral hypertrophic changes at C5-C6 level;" "an increase of the normal thoracic kyphosis;" "rotation malposition of T2, T4, T5 right and T6 and T8 left;" loss of the normal lumbar lordosis; rotation malposition at L1 through L3 left; "decreased disc spacing at the L5-S1 level, complicated by vertebral hypertrophic changes at L5-S1 level;" "posterior sacral apex;" "left lateral lumbar deviation/antalgia;" and "an AI sacrum on the right." (Tr. 209).

An MRI of plaintiff's lumbar spine, taken on January 14, 2010 at Elmont MRI, showed normal discs at the L1-2, L2-3, L3-4 and L4-5 level; "slight retrolisthesis of L5 on S1 with bulging disc material extending across the neural canal from the right to the left lateral recess;" bilateral foraminal extension very minimally crowded the existing roots; and protruding disc material extending over the central posterior upper cortical margin of S1. (Tr. 210).

An MRI of plaintiff's right knee, taken on January 19, 2010 at Stand-up MRI of Queens, showed synovial effusion in the knee joint; anterior soft tissue swelling; medial soft tissue varices; mild posterior patellar/anterior femoral chondromalacia; and narrowing of the medial demoral tibial joint compartment with chondromalacia. (Tr. 212).

On January 27, 2010, Dr. Michael Schwartz ("Dr. Schwartz"), of ProHealth Orthopedics, completed a physical examination of plaintiff, during which plaintiff complained of right knee pain following a December 31, 2009 motor vehicle accident. (Tr. 214). Upon physical examination, there was no evidence of any swelling, erythema or atrophy; the patella tracked well in the trochlear groove; there was full extension of the knee and discomfort with flexion beyond one hundred five (105) degrees; motor strength was 5/5 "including knee flexion and extension[;]" no atrophy was seen and sensation was intact; there was no valgus instability and a negative "Lachman" test; and there was negative posterior drawer, tenderness along the medial and lateral joint lines and mild effusion present. (Id.). Dr. Schwartz diagnosed plaintiff with "[r]ight knee chondromalacia patellar[;]" injected plaintiff's knee with two (2) cc's of Dexamethasone, one (1) cc of Lidocane and one (1) cc of Macaine; and recommended that plaintiff undergo physical therapy and follow up with him in four (4) weeks. (Tr. 215).

On January 30, 2010, Dr. Jagga Rao Alluri ("Dr. Alluri"), a neurophysiologist, examined plaintiff based on complaints of "sharp" neck pain, which plaintiff rated at 10/10, radiating to the right arm with associated numbness; "sharp" low back pain, which plaintiff rated at 10/10 and indicated increased when she stood up, radiating to the right lower extremity with associated numbness in the right thigh; right knee pain that increased with bending; and difficulty walking. (Tr. 217). A neurological examination revealed that the patient was alert and oriented; cranial nerves were normal; and plaintiff's gait was normal. (Tr. 218). Examination of plaintiff's upper extremities revealed "decreased pinprick of the C5-C6 nerve distribution" and deltoid and bicep strength at 4/5, but was otherwise normal or unremarkable. (Id.) An examination of the lower extremities showed normal pinprick, motor function and reflexes, but straight leg raising was

5

positive at thirty (30) degrees. (Tr. 219). Dr. Alluri diagnosed patient with "right knee internal derangement." (Id.)

An MRI of plaintiff's cervical spine, taken on February 4, 2010 at Elmont MRI, showed no evidence of recent wedge fracture; no spondylolisthesis; "mild chronic appearing loss of vertical height of the C5 and C6 vertebral segments[;]" small posterior lateral uncovertebral spur formation at C5-C6 and C6-C7; diminished signal intensity consistent with dehydration of disc material from C2-C3 through C6-C7; focal two (2) millimeter midline bulge at C3-C4; broad-based two (2) millimeter bulge at C4-C5; three (3) millimeter broad-based sub-ligamentous herniation coming into the ventral surface of the cervical cord at C5-C6; two (2) millimeter broad-based bulge at C6-C7; no bulge or herniation at C2-C3 and C7-T1; and no mass, edema or syringomyelia of the cervical cord. (Tr. 223).

On February 16, 2010, Dr. Schwartz examined plaintiff during a follow-up appointment, at which time plaintiff complained of right knee pain, that the injection she received on January 27, 2010 only relieved the pain in her right knee for one (1) day and that the physical therapy treatment she was receiving was similarly ineffective. (Tr. 176). Upon physical examination, there was no evidence of erythema; the patella tracked well in the trochlear groove; there was full extension and flexion of the knee to one hundred and five (105) degrees; motor strength was 5/5; there was no atrophy; sensation was intact; there was no varus or valgus instability; a "Lachman test" was negative; the medial joint line was tender; and effusion was present. (Id.) Dr. Schwartz reviewed the results of an MRI; diagnosed plaintiff with a "right knee medial meniscal tear with continued pain;" advised plaintiff to "modify her activity;" and discussed the potential risks and benefits of surgery with plaintiff. (Id.)

On February 23, 2010, Dr. Schwartz performed a right knee arthroscopy; a partial lateral meniscectomy; right knee chondroplasty and a right knee synovectomy on plaintiff. (Tr. 181). A postoperative diagnosis indicated that plaintiff had a right knee tear of the lateral meniscus; synovitis and chondromalacia in her right knee. (Id.).

On February 27, 2010, Dr. Alluri examined plaintiff during a follow-up appointment at which time plaintiff complained of low back pain, radiating to the lower extremity; neck pain radiating to her upper extremities; and "limping secondary to pain." (Tr. 181). Upon physical examination, plaintiff's cranial nerves two (2) through eight (8) were intact; deep tendon reflexes were 2+ in the upper extremities; there was decreased pinprick over the C5 and C6 nerve distribution and weakness of the deltoid and biceps, graded at four out of five (4/5); quadriceps were 2+ and Achilles were 1+; straight leg raising was positive at thirty (30) degrees; and there was spasm of the lumbar paraspinal muscles. (Id.) A nerve conduction study was normal, but an EMG was consistent with right S1 radiculopathy. (Id.). Dr. Alluri diagnosed plaintiff with right S1 radiculopathy and recommended that she continue her chiropractic care. (Id.).

On March 4, 2010, Dr. Alluri again examined plaintiff, at which time plaintiff complained of right knee pain; low back pain, radiating to the right thigh with associated numbness; and neck pain radiating to her right arm with associated numbness. (Tr. 183). Examination remained unchanged from the previous visit. (Id.). A nerve conduction study was normal, but an EMG was consistent with right C5 radiculopathy. (Id.). Dr. Alluri diagnosed plaintiff with right C5 radiculopathy and advised her to "continue [her] present course of therapy." (Id.).

7

Upon physical examination of plaintiff by Dr. Abessinio on May 10, 2010, Soto-Hall and Vara-Valga tests were positive; there was decreased range of motion of the cervical spine with flexion to forty (40) degrees, extension to twenty (20) degrees, right rotation to thirty-five (35) degrees, left rotation to thirty (30) degrees, right lateral flexion to fifteen (15) degrees, and left lateral flexion to fifteen (15) degrees; there was decreased range of motion of the thoraco-lumbar spine with flexion to forty-five (45) degrees, extension to fifteen (15) degrees, right rotation to ten (10) degrees, left rotation to ten (10) degrees, right lateral flexion to ten (10) degrees, and left lateral flexion to ten (10) degrees.  (Tr. 235).

Upon physical examination of plaintiff by Dr. Abessinio on July 19, 2010, Soto-Hall and Vara-Valga test results remained positive; range of motion of plaintiff's cervical spine improved from the previous visit, but remained decreased with flexion to forty-five (45) degrees, extension to twenty-five (25) degrees, right rotation to forty-five (45) degrees, left rotation to forty (40) degrees, right lateral flexion to twenty (20) degrees, and left lateral flexion to twenty (20) degrees; and range of motion of plaintiff's thoraco-lumbar spine remained unchanged from the previous visit, except that there was slight improvement in flexion to fifty (50) degrees and left rotation to fifteen (15) degrees.  (Tr. 235).

On September 4, 2010, Dr. Abessinio completed a "medical assessment of ability to do work related activities," indicating that plaintiff could lift or carry a maximum of eight (8) pounds occasionally and five (5) pounds frequently; could stand and/or walk for one half (1/2) an hour without interruption and one (1) hour total in an eight (8) hour work day; could sit for fifteen (15) minutes without interruption and one (1) hour total in an eight (8) hour work day; and could not climb, stoop, kneel, balance crouch or crawl.  (Tr. 276-77).  In addition, the report

8

indicates that plaintiff's impairments affected her ability to reach as well as push and pull and that plaintiff experienced environmental restrictions to height, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, vibration and "other." (Id.)

On September 14, 2010, Dr. Abessinio completed a "New York State Office of Temporary and Disability Assistance: Division of Disability Determinations" evaluation report indicating that plaintiff had received chiropractic treatment three (3) times a week as of January 5, 2010; could lift and carry eight (8) pounds occasionally, up to one-third (1/3) of a work day; could stand or walk less than two (2) hours per day; could sit less than six (6) hours per day; was limited in her ability to push and/or pull; and had no postural, manipulative, visual, communicative or environmental limitations. (Id.)

### 2.    SSA's Medical Consultants

On November 9, 2010, Linell Skeene, M.D. ("Dr. Skeene") performed an orthopedic examination of plaintiff by way of referral from the Division of Disability Determination. (Tr. 283-86). Upon physical examination, plaintiff had a normal gait; was unable to walk on her heels or toes and to squat fully; used no assistive walking device; needed no help changing for the exam or getting on or off the exam table; and was able to rise from a chair without difficulty. (Tr. 285). Dr. Skeene noted that plaintiff's hand and finger dexterity was intact and she had grip strength of 5/5, bilaterally. (Id.) Upon examination of plaintiff's upper extremities, there was full range of motion of shoulders, elbows, forearms, wrists and fingers bilaterally; no joint inflammation, effusion or instability; strength was 5/5 in proximal and distal muscles; there was

no muscle atrophy; no sensory abnormality; and reflexes were physiologic and normal. (Id.). Upon examination of the thoracic and lumbar spine, there was limited range of motion in the lumbar spine, with flexion at forty-five (45) degrees, lateral flexion bilaterally at ten (10) degrees and lateral rotation bilaterally at twenty (20) degrees; mild tenderness over the lumbar spine, but no sciatic notch tenderness; mild paraspinal muscle spasm; no scoliosis or kyphosis; and "no trigger points." (Id.) Upon examination of the lower extremities, there was full range of motion of the hips, in the left knee and in the ankles bilaterally; there was limited range of motion in the right knee, with flexion and extension to seventy-five (75) degrees; there was no muscle atrophy or sensory abnormality; reflexes were physiologic and equal; and there was no joint effusion, inflammation or instability. (Id.). Dr. Skeene diagnosed plaintiff with disc disease of the lumbar and cervical spine and an "old compression fracture of C5," and opined that plaintiff "had moderate limitations for prolonged standing, walking and heavy lifting due to limited range of motion of the lumbar spine." (Tr. 286).

X-rays of plaintiff's right knee and cervical spine taken on November 11, 2010 revealed medial joint space narrowing in plaintiff's right knee, but no evidence of acute fracture, dislocation or destructive bony lesion; narrowing of the C5-C6 disc space; mild anterior wedging of C5; and reversal of the cervical curvature. (Tr. 287-88).

### 3.    SSA's RFC Assessment

On November 17, 2010, D. Newsome, a disability analyst, evaluated evidence in plaintiff's file in order to determine her residual functional capacity ("RFC"). (Tr. 293). Based upon the facts that plaintiff had a normal gait, was unable to walk on her heels or toes or to squat

fully, had limited range of motion and tenderness of the cervical and lumbar spine, had moderate paracervical muscle spasm and mild paraspinal muscle spasm, had negative straight leg raising tests bilaterally, had limited range of motion of the right knee, and had 5/5 strength for her proximal and distal muscles bilaterally, Newsome opined that plaintiff could occasionally lift and/or carry twenty (20) pounds; could frequently lift and/or carry ten (10) pounds; could stand and/or walk for about six (6) hours in an eight (8) hour workday; could sit with normal breaks for about six (6) hours in an eight (8) hour workday; had no limitation in her ability to push and pull, including the operation of hand or foot controls; could occasionally climb, balance, stoop, kneel, crouch and crawl; and had no manipulative, visual, communicative or environmental limitations. (Id.) Although Newsome credited plaintiff's claim that she was unable to walk more than half a block due to her back and knee pain, he did not credit her limitation to the degree alleged because, *inter alia*, she is able to bathe and dress independently. (Id.) According to Newsome, "the degree of [activities of daily living] in conjunction with the objective medical findings-signs, symptoms and laboratory findings demonstrates that the [plaintiff] is credible, but not to the degree alleged." (Id.)

### 4. Following Plaintiff's Second Motor Vehicle Accident[2]

An MRI of plaintiff's lumbar spine on January 31, 2011 revealed scoliotic lumbar curvature with lumbar kyphosis; T11-12, right sided posterior disc bulge; "L4-5 posterior disc

---

[2] Plaintiff testified that she was involved in a second motor vehicle, in which she injured her shoulder, neck and back, in January 2011, after the SSA's medical consultation and RFC assessment, but prior to the hearing on August 31, 2011. (Tr. 50).

bulge flattens the ventral thecal sac[;]" L5-S1, diminished disc space height, disc hydration loss

and grade one (1) retrolisthesis with a posterior disc herniation at the level extending to the

narrow of the foramina; inferior L5 vertebral disc adjacent osseous reactive edema; and fatty

infiltration of the filum terminale. (Tr. 297.)

An MRI of plaintiff's cervical spine on February 3, 2011 revealed kyphotic cervical

curvature; C2-3 through C6-7 disc hydration loss; C3-4 through C6-7 posterior disc herniation;

impress ventral CSF with central stenosis; C4-5 and C5-6 ventral cord impression; T4-5 posterior

disc herniation impresses ventral thecal sac; and cerebellar tonsillar ectopia. (Tr. 298).

On March 15, 2011, Dov Berkowitz, M.D. performed a manipulation of plaintiff's left

shoulder; arthroscopy of the left shoulder and subacromial space; a synovectomy;

decompression; a partial distal claviculectomy; and an intra-articular capsular release, based upon

a diagnosis of impingement syndrome of the left shoulder and a partially frozen shoulder. (Tr.

299).

On October 5, 2011, Dr. Abessinio completed a second "medical assessment of ability to

do work related activities," indicating that plaintiff could lift or carry a maximum of five (5)

pounds occasionally and five (5) pounds frequently; could stand and/or walk for twenty-five (25)

minutes without interruption and for a total of (2) hours in an eight (8) hour workday; could sit

for twenty (20) minutes without interruption and for a total of two (2) hours, in an eight (8) hour

workday; could not climb, stoop, kneel, balance, crouch or crawl; experienced environmental

restrictions to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes,

humidity, vibration and "other;" was limited in her ability to reach, push and pull; and "remains

12

totally disabled at present." (Tr. 301-02). Dr. Abessinio further noted that "[d]aily spinal exacerbation * * * limits [plaintiff's] household activities." (Id.)

### B. Non-Medical Records

#### 1. Disability Report

An adult disability report (Form SSA-3368), completed on behalf of plaintiff by the Social Security field office, (Tr. 116-121), identifies plaintiff's alleged impairments as right knee tear of lateral meniscus, right knee synovitis, right C5 radiculopathy and broad-based C5-C6 disc herniation and indicates that plaintiff completed four (4) years of college and had work experience as a bookkeeper for fifteen (15) years. (Tr.117).

#### 2. Work History Report

A work history report completed on plaintiff's behalf indicates that plaintiff previously worked as a bookkeeper from 1987 until August 2008. (Tr. 122-128).

#### 3. Function Report

Plaintiff completed a function report on September 19, 2010, (Tr. 129-136), in which she indicated, *inter alia*, that: (1) her condition limits her ability to bathe because she "can't bend to soap and wash lower body;" (2) her condition limits her ability to use the toilet because "its [sic] very hard to bend to sit on toilet and getting up is very hard;" (3) she has no other issues regarding personal care; (4) she prepares meals on a daily basis; (5) she engages in certain

household chores, including cooking and doing the dishes, but refrains from engaging in yard work; (6) she leaves the house to attend doctors' appointments; (7) she does not drive because it can be painful and bothersome; (8) she shops for groceries once a week for fifteen (15) minutes; (9) she is able to pay her bills, count change and handle a savings account; (10) she attends church once a week; (11) she can walk one half (½) of a block before she has to stop and rest; (12) she has no trouble paying attention or completing tasks; (13) she can follow spoken and written instructions and has no problems getting along with people in authority; and (14) she has trouble sleeping because it is painful. (Tr. 129-136).

### D. Hearing

#### 1. Plaintiff's Testimony (Tr. 34-55)

On August 31, 2011, a hearing was held before Administrative Law Judge Andrew S. Weiss ("the ALJ"), at which plaintiff gave the following testimony, (Tr. 34-55):

Plaintiff was forty-eight (48) years old, had graduated college from York College in Jamaica, Queens and was not currently working. (Tr. 37-38). The last time she worked was on August 13, 2008, when she was laid off from her job. (Tr. 38.)

Plaintiff was in a car accident on December 31, 2009, in which she injured her right knee, neck, shoulders and back, (Tr. 41), and following which she was brought to the hospital and released the same day. (Tr. 39). She had arthroscopic surgery on her knee on February 23, 2010, which helped "a little bit." (Tr. 41-42). She continues to have pain in her back and neck that

makes it difficult to sit for more than fifteen (15) or twenty (20) minutes without adjusting herself and having to stand up. (Tr. 42). She is able to get up and down to adjust herself. (Id.)

Plaintiff was previously employed as a bookkeeper and her hands are "okay," but there is some numbness on the right side which makes it difficult for her to write. (Id.) Plaintiff did not think that she could go back to work because "there is too much pain." (Tr. 46). She takes painkillers everyday for the pain, attends physical therapy three (3) times a week and sees a chiropractor twice a week. (Id.). Plaintiff drives herself to the chiropractor, which is approximately five (5) to ten (10) minutes away, but her friend had driven her to the hearing that day. (Tr. 47).

Plaintiff lives with her daughter, who is twenty-eight (28) years old, and her daughter does the shopping. (Id.)

Plaintiff worked as a bookkeeper for twenty-one (21) years and her job required her to lift and carry items weighing approximately twenty (20) to thirty (30) pounds, (Tr. 48), and to sit for less than three (3) hours a day. (Id.) During the rest of her workday, she would "[have] to get things approved . . . have to see the CFO, and . . . have to mail stuff out, filing heavy documents." (Id.)

Following the first car accident, plaintiff was treated by Drs. Alluri, Abessinio and Schwartz; she had MRIs of her knee, lumbar spine and cervical spine; and she had surgery on her right knee. (Tr. 50). Following a second car accident in January 2011, in which she injured her left shoulder, neck and back, plaintiff was treated by Dr. Berkowitz, who performed surgery on her shoulder. (Id.)

Plaintiff testified that she has severe pain, which she rated at "seven and a half, eight"

15

(7½-8) on a scale of one (1) to (10); that she takes medication that makes her "go to sleep[;]" that she previously enjoyed the work she did; that prior to her accident, she used to live a very active life, including activities such as going to the gym, dining out, shopping, cooking and cleaning; that she has difficulty getting dressed; that bending makes it difficult for her to put on her shoes, pants and undergarments; that her daughter has had to help her put on her top because she "can't get [her] arm over [her] head . . . . "; and that she did not think she could return to work as a bookkeeper because she is in a lot of pain and the job includes "a lot of lifting, bending, carrying heavy boxes and sitting," and she cannot sit or stand for "too long." (Tr. 50-53).

### E.     The ALJ's Decision

After applying the five (5)-step sequential analysis forth in 20 C.F.R. § 404.1520, the ALJ found that plaintiff was "not disabled" within the meaning of the Act. Specifically, the ALJ determined: (1) that plaintiff meets the insured status requirements of the Social Security Act through December, 31, 2013, (Tr. 21); (2) that plaintiff has not engaged in substantial gainful activity since December 31, 2009, the alleged onset date, (Id.); (3) that plaintiff "has the following severe impairments: disk disease of the lumbar spine and cervical spine, status post arthroscopy of the right knee, and left shoulder disorder, status post arthroscopy[,]" (Id.); (4) that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (Tr. 21); (5) that plaintiff has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), (Tr. 21); (6) that plaintiff is capable of

16

performing her past relevant work as a bookkeeper, (Tr. 23); and (7) that plaintiff "has not been under a disability, as defined in the Social Security Act, from the onset date to the date of th[e] [ALJ's] decision." (Tr. 24).

Plaintiff submitted a request for review of the ALJ's decision by letter dated September 27, 2011. (Tr. 14-15). On May 11, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3).

## II.    DISCUSSION

### A.    Standard of Review

The applicable standard of review under 42 U.S.C. § 405(g) is whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Brault v. Social Sec. Admin., Com'r, 683 F.3d 443, 447 (2d Cir. 2102) (quoting Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)). "'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). "In determining whether the [Commissioner's] findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian, 708 F.3d at 417 (quoting Monguer v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's

conclusions of law or application of legal standards. Byam v. Barnhart, 336 F.3d 172, 179 (2d

Cir. 2003); Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a

statutory and constitutional duty to ensure that the Commissioner has applied the correct legal

standards, regardless of whether the Commissioner's decision is supported by substantial

evidence. Pollard v. Halter, 377 F.3d 183, 188–89 (2d Cir. 2004). If a court finds that the

Commissioner has failed to apply the correct legal standards, the Commissioner's decision must

be reversed, Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008), unless the error was harmless.

See Zabala v. Astrue 595 F.3d 402, 409 (2d Cir. 2010) (holding that remand is unnecessary

where application of the correct legal standard could lead only to the same conclusion); cf.

Pollard, 377 F.3d at 189 (holding that the Commissioner's decision must be reversed "[w]here an

error of law has been made that might have affected the disposition of the case." (emphasis

added)).

Pursuant to 42 U.S.C. § 405(g), upon review of the final decision of the Commissioner, a

court may enter "judgment affirming, modifying, or reversing the decision . . . with or without

remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, remand is appropriate

when the court finds that there are gaps in the administrative record or that the ALJ has applied

an improper legal standard, see Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999), or when the

court is "'unable to fathom the ALJ's rationale in relation to the evidence in the record' without

'further findings or clearer explanation for the decision.'" Pratts v. Chater, 94 F.3d 34, 39 (2d

Cir. 1996) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).

## B.  Evaluation of Disability

Title II of the Social Security Act, relating to the denial of disability benefits, defines "disability," in relevant part, as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under [Title II of the Act], the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B); see also 20 C.F.R. § 404.1523.  As defined by the Act, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

19

Pursuant to regulations promulgated under the Act, the Commissioner is required to apply a five (5)-step sequential analysis to determine whether an individual is disabled under Title II of the Act. 20 C.F.R. § 404.1520; see also Talavera v. Astrue 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner next considers the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii). Under this second step of the sequential analysis, it must be determined whether the claimant's impairment or combination of impairments "significantly limits [his or her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At the third step, the Commissioner again considers the medical severity of the claimant's impairment to determine whether it "meets or equals one of [the] listings in appendix 1 [to subpart P of 20 C.F.R. Part 404 of [the Act] ("the Listings")] and meets the duration requirement." 20 C.F.R. §§ 404.1520(a)(4)(iii) and (d). If the claimant's impairment does not meet or equal any of the Listings or meet the applicable duration requirement, the Commissioner must assess and determine the claimant's residual functional capacity ("RFC"), 20 C.F.R. § 404.1520(e), and, at the fourth step of the sequential analysis, compare it to the physical and mental demands of the claimant's past relevant work in order to determine whether he or she can engage in his or her past work. See 20 C.F.R. § 404.1520(a)(4)(iv) and (f). If the claimant cannot do his or her past relevant work, the last step

20

of the sequential analysis requires the Commissioner to consider his RFC assessment, together with the claimant's vocational factors, i.e., his or her age, education and work experience, in order to determine if the claimant "can make an adjustment to other work" existing in the national economy. See 20 C.F.R. §§ 404.1520(a)(4)(v) and (g); 404.1560(c). The claimant has the burden of proving the first four (4) steps of the sequential analysis, whereas the Commissioner has the burden of proof on the fifth step of the analysis. See Talavera 697 F.3d at 151.

## C.     Application of the Five-Step Sequential Analysis

### 1.     RFC Assessment[3]

Plaintiff contends that the ALJ erred in finding that she has the RFC to perform the full range of sedentary work because (1) he erroneously afforded "significant weight" to the opinion of Dr. Skeene and "little weight" to Dr. Abessinio's opinion; and (2) his credibility assessment was erroneous insofar as he failed to consider all of her testimony regarding her activities of daily living and treatment, he did not take into account her positive work history and he considered the consistency of her statements concerning the intensity, persistence and limiting effects of her symptoms with his own RFC finding instead of evaluating all of the relevant factors bearing upon her credibility.

When a claimant's impairments fail to meet or equal any of the Listings, the Commissioner must assess the claimant's RFC before proceeding to the fourth and fifth steps of the sequential analysis. See 20 C.F.R. §§ 404.1520(e); 404.1545(a)(5). A claimant's RFC is

---

[3] Neither party challenges the ALJ's findings at the first three (3) steps of the sequential analysis.

21

"the most [she] can still do despite [her] limitations." See 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the Commissioner must consider all of the claimant's medically determinable impairments, including those that are not found to be "severe." 20 C.F.R. § 404.1545(a)(2). The Commissioner's RFC assessment must be based on "all of the relevant medical and other evidence" in the case record, including any statements about what the claimant can still do that have been provided by medical sources and any descriptions and observations about the claimant's limitations from his or her impairments, including limitations resulting from his or her symptoms, such as pain, provided by the claimant or any other person. See 20 C.F.R. § 404.1545(a)(3). In addition, the Commissioner must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Both a "limited ability to perform certain physical demands or work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)," 20 C.F.R. § 404.1545(b), and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting," 20 C.F.R. § 404.1545(c), may reduce a claimant's ability to do past or other work. 20 C.F.R. § 404.1545(e) provides that:

> "[w]hen [a claimant] ha[s] severe impairment(s), but [his or her] symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in [the Listings], [the Commissioner] will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [his or her] residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; * * *. In assessing the total limiting

effects of [a claimant's] impairment(s) and any related symptoms, [the Commissioner] will consider all of the medical and nonmedical evidence, * * *."

### a.    Sufficiency of Dr. Skeen's Opinion

In Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), superceded by regulation on other grounds, 20 C.F.R. § 404.1560(c)(2), the Second Circuit found that a doctor's opinion that the claimant's "impairment is: [l]ifting and carrying moderate; standing and walking, pushing and pulling and sitting mild[,]" was "so vague as to render it useless in evaluating whether [the claimant] can perform sedentary work." The Court further held that "[i]n particular, [the doctor's] use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ * * * to make the necessary inference that [the claimant] can perform the exertional requirements of sedentary work." Id. Thus, plaintiff contends that Dr. Skeene's opinion that plaintiff "has moderate limitations for prolonged standing, walking, and heavy lifting due to limited range of motion of the lumbar spine," (Plf. Mem., at 12), was too vague to be entitled to the "significant weight" afforded to it by the ALJ.

Contrary to plaintiff's contention, the "mere use of the phrase 'moderate limitations' does not render [a doctor's] opinion vague or non-substantial for purposes of the ALJ's RFC determination." Mancuso v. Colvin, No. 12-cv-6425, 2013 WL 3324006, at * 4 (W.D.N.Y. July 1, 2013). Dr. Skeene's opinion that plaintiff "has moderate limitations for prolonged standing, walking, and heavy lifting due to limited range of motion of the lumbar spine," (Tr. 286), was based upon her findings, upon her examination of plaintiff, *inter alia*, that plaintiff was unable to walk on her heels or toes or to squat fully; had limited range of motion, mild tenderness and mild paraspinal muscle spasm in her lumbar spine; and had limited range of motion in her right knee, but had a

normal gait; used no assistive walking device; needed no assistance changing for the examination or getting on or off the examination table; was able to rise from a chair without difficulty; had full range of motion in her shoulders, elbows, forearms, wrists, fingers, hips, left knee and ankles; had no joint inflammation, effusion or instability in her upper or lower extremities; had 5/5 strength in her proximal and distal muscles of bother her upper and lower extremities bilaterally; had no muscle atrophy or sensory abnormality in her upper or lower extremities; and had no sciatic notch tenderness, scoliosis, kyphosis or "trigger points" in her thoracic and lumbar spine. (Tr. 285-86). In addition, Dr. Skeene reported that plaintiff's hand and finger dexterity was intact; she had a grip strength of 5/5 bilaterally; and her reflexes were physiologic and normal. (Tr. 285-86). Since Dr. Skeene's opinion was supported by "additional information," i.e., objective medical findings, her opinion is not vague and provided an adequate basis for the ALJ to infer that plaintiff is capable of performing the exertional requirements of sedentary work. See, e.g. Stivers v. Colvin, No. 5:11-cv-1019, 2013 WL 3327958, at * 3 (N.D.N.Y. July 2, 2013); Mancuso, 2013 WL 3324006, at * 4. Accordingly, the ALJ's determination to afford Dr. Skeene's opinion significant weight was not erroneous.

### b.   Treating Physician Rule

Plaintiff's contention that the ALJ erroneously afforded reduced weight to the opinion of Dr. Abessinio, a chiropractor, is also without merit.

The Second Circuit has held that:

"[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant. 'A treating physician's statement that the claimant is disabled cannot itself be determinative'

24

> Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999). However, SSA regulations advise
> claimants that 'a treating source's opinion on the issue(s) of the nature and severity
> of your impairment(s)' will be given 'controlling weight' if the opinion is 'well
> supported by medically acceptable clinical and laboratory diagnostic techniques and
> is not inconsistent with the other substantial evidence in [the] case record.' 20 C.F.R.
> § 404.1527(d)(2) * * *."

Greener–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (emphasis omitted); see also

Selian, F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's

impairments is binding if it is supported by medical evidence and not contradicted by substantial

evidence in the record.")

   "Although the treating physician rule generally requires deference to the medical opinion

of a claimant's treating physician * * *, the opinion of the treating physician is not afforded

controlling weight where * * * the treating physician issued opinions that are not consistent with

other substantial evidence in the record, such as the opinions of other medical experts." Halloran

v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); see also Burgess v. Astrue, 537

F.3d 117, 128 (2d Cir. 2008) (accord); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)

(holding that while the opinions of a treating physician deserve special respect, they need not be

given controlling weight where they are contradicted by other substantial evidence in the record);

20 C.F.R. § 404.1527(c)(2).

   SSA regulations require that an ALJ who refuses to afford controlling weight to the

medical opinion of a treating physician consider the following factors in determining how much

weight to accord the opinion: "(i) the frequency of examination and the length, nature and extent

of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii)

the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a

specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion." Halloran, 362 F.3d at 32; see also 20 C.F.R. § 404.1527(c); The Commissioner must provide "good reasons" for the weight attributed to the treating physician's opinion. See Burgess, 537 F.3d at 129-130; Halloran, 362 F.3d at 32-33; 20 C.F.R. § 404 1527(c)(2).

Pursuant to SSA regulations, chiropractors, like Dr. Abessinio, are not considered "acceptable medical sources," and, thus, their opinions are not entitled to controlling weight under the treating physician rule. 20 C.F.R. § 404.1513(a) ("Acceptable medical sources are – (1) Licensed physicians (medical or osteopathic doctors); (2) Licensed or certified psychologists . . . ; (3) Licensed optometrists . . . ; (4) Licensed podiatrists . . . ; and (5) Qualified speech-language pathologists . . . ."); see Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995); see also Britt v. Astrue, No. 10-cv-6200T, 2011 WL1561076, at *11(W.D.N.Y. Apr. 25, 2011) aff'd 486 F. App'x 161(2d Cir. June 20, 2012). Rather, chiropractors are "expressly listed in a different section, under 'other sources' whose information may also help us to understand how your impairment affects your ability to work." Diaz, 59 F.3d at 313 (alterations, quotations and citation omitted); 20 C.F.R. § 404.1513(d)(1). Thus, "the ALJ has the discretion to determine the appropriate weight to accord the chiropractor's opinion based on all the evidence before him * * *." Diaz, 59 F.3d at 313. Since Dr. Abessinio is a chiropractor, not a licensed physician or other acceptable medical source, the ALJ was free to discount his opinions in favor of the opinions from medical doctors. See, e.g. id. at 313-14.

Moreover, where there is other substantial evidence in the record that conflicts with the treating physician's opinion, the opinion will not be afforded controlling weight, see Veino, 312 F.3d at 588; Snell, 177 F.3d at 133, and "the less consistent that opinion is with the record as a

whole, the less weight it will be given." Snell, 177 F.3d at 133; 20 C.F.R. § 404.1527(c)(4);

("Generally, the more consistent an opinion is with the record as a whole, the more weight [it]

will [be] give[n] * * *.") "[G]enuine conflicts in the medical evidence are for the Commissioner

to resolve." Burgess, 537 F.3d at 128 (quoting Veino, 312 F.3d at 588). Furthermore, "the

ultimate finding of whether a claimant is disabled and cannot work [is] reserved to the

Commissioner." Snell, 177 F.3d at 133 (quotations and citation omitted); 20 C.F.R. §

404.1527(d)(1); see also Green-Younger, 335 F.3d at 106. Accordingly, although the SSA must

consider the data provided by the physicians, it must "draw[] its own conclusions as to whether

th[at] data indicate[s] disability." Snell, 177 F.3d at 133.

The ALJ noted that Dr. Abessinio's opinion should be not be given controlling weight

because it was inconsistent with substantial objective medical evidence in the record. (Tr. 21.)

For example, Dr. Abessinio's opinion that plaintiff was "totally disabled;" could only lift or carry

a maximum of eight (8) pounds occasionally and five (5) pounds frequently; could only stand or

walk for thirty (30) minutes without interruption, and a total of one (1) hour in an eight (8) hour

work day; and could only sit for fifteen (15) minutes without interruption, and a total of one (1)

hour in an eight (8) hour workday, (Tr. 276-77, 302), was inconsistent with the opinion of Dr.

Skeene, an orthopedist, that plaintiff had only "moderate limitations for prolonged standing,

walking and heavy lifting due to limited range of motion of the lumbar spine." (Tr. 286). As set

forth above, since Dr. Skeene's opinion was supported by objective medical findings, the ALJ

was entitled to afford that opinion significant weight. Moreover, Dr. Skeene's opinion was

supported by Dr. Alluri, a neurophysiologist, who reported, *inter alia*, that plaintiff had a normal

gait; that examination of plaintiff's upper extremities was normal or unremarkable except for

"decreased pinprick of the C5-C6 nerve distribution" and weakness of the deltoid and biceps at 4/5; and that examination of plaintiff's lower extremities showed normal pinprick, motor function and reflexes, although straight leg raising was positive at thirty (30) degrees, (Tr. 181, 183, 217-18); and by Dr. Schwartz, an orthopedist, who reported that there was tenderness along the medial and lateral joint lines of plaintiff's right knee, but there was no evidence of any swelling, erythema or atrophy; the patella tracked well in the trochlear groove; there was full extension and flexion of the knee to one hundred and five (105) degrees; motor strength was 5/5, "including knee flexion and extension[;]" sensation was intact; there was no varus or valgus instability; Lachman and posterior drawer tests were negative; and there was only mild effusion present. (Tr. 176, 214). Since the opinion of Dr. Abessinio, a chiropractor, was inconsistent with substantial evidence in the record, including the opinions and medical findings of three (3) medical doctors, the ALJ's decision to afford it little weight was not erroneous.

### c.    Plaintiff's Credibility

Plaintiff challenges the ALJ's conclusion that, although her medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements regarding the intensity, persistence and the limiting effects of these symptoms were not credible. (Pl. Mem. at 19-22). According to plaintiff, the ALJ's credibility determination was "unsupported by substantial evidence." (Pl. Mem. at 20).

In "determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account * * *, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of

28

the claimant's testimony in light of the other evidence in the record." <u>Genier v Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).

Contrary to plaintiff's contention, the ALJ's credibility determination was supported by substantial evidence in the record insofar as plaintiff's subjective symptoms were contradicted by the medical findings of Drs. Skeene, Schwartz and Alluri, as set forth above. Moreover, there was other evidence that plaintiff could shop for groceries; pay her bills, count change and handle a savings account; attend church and doctors' appointments, to which she drove herself; accomplish household chores, including doing the dishes; and prepare meals on a daily basis. (Tr. 129-36). Given all of the evidence in the record, the ALJ properly found that plaintiff's testimony about her limitations was not fully credible. <u>See</u> <u>Poupore v. Astrue</u>, 566 F.3d 303, 307 (2d Cir. 2009).

Since it was not error for the ALJ to afford significant weight to Dr. Skeene's opinion and little weight to Dr. Abessinio's opinion, and the ALJ properly weighed plaintiff's credibility in light of the other evidence in the record, the ALJ's RFC assessment, i.e., that plaintiff was capable of performing a full range of sedentary work, which involves lifting no more than ten (10) pounds at a time; occasionally lifting or carrying small articles (such as docket files, ledgers and small tools); and sitting, with only occasional walking and standing, <u>see</u> 20 C.F.R. § 404.1567(a), is supported by substantial evidence in the record.

### 2.    Step Four

Based upon his assessment of plaintiff's RFC, the ALJ determined that plaintiff was capable of performing her past relevant work as a bookkeeper, (Tr. 23), which is generally

described as skilled, sedentary work, <u>see</u> DOT 210.382-014,[4] and thus, that plaintiff is not disabled. <u>See</u> 20 C.F.R. §§ 404.1565; 404.1560(b)(2).

### a. Plaintiff's Past Relevant Work

Plaintiff's contention that the ALJ erred in finding that she is able to perform her past relevant work as a bookkeeper because he "failed to make the required specific findings of fact[,]" regarding the physical and mental demands associated with her past work, (Pl. Mem. at 22-24), is without merit. The ALJ found, based upon plaintiff's testimony at the hearing, that she had previously performed her work as a bookkeeper at a light exertional level. The DOT describes bookkeeper as skilled, sedentary work. <u>See</u> DOT 210.382-014. A finding that a plaintiff is not disabled under 20 C.F.R. § 404.1520(iv) because they are capable of performing past relevant work does not require the ALJ to determine that the plaintiff "is able to perform the duties of her previous job, but whether the [plaintiff] is able to perform the duties associated with her previous 'type' of work." <u>Halloran</u>, 362 F.3d at 33 (citing <u>Jock v. Harris</u>, 651 F.2d 133, 135 (2d Cir. 1981)). Based upon the entire record, including the objective medical evidence, the opinions of acceptable medical sources and the evidence regarding plaintiff's activities of daily living, the ALJ's determinations that plaintiff is able to perform her past relevant work, i.e., that her impairments do not prevent her from returning to her prior type of employment, and that plaintiff is, therefore, not disabled, are supported by substantial evidence.[5]

---

[4] Dictionary of Occupational Titles.

[5] In light of this determination, it is unnecessary to consider plaintiff's remaining contention that the ALJ's alternative determination at the fifth step of the sequential analysis was unsupported by substantial evidence in the record. Nonetheless, since the only evidence of any non-exertional impairment in the record is the opinion of Dr. Abessinio and plaintiff's own testimony, both of

### III. Conclusion

Based upon the foregoing, the Commissioner's motion for judgment on the pleadings is granted, plaintiff's motion for judgment on the pleadings is denied and the Commissioner's decision is affirmed.   The Clerk of the Court shall close this case.

SO ORDERED.

s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 21, 2013

---

which were properly discredited by the ALJ for the reasons set forth above, the ALJ did not err in relying solely upon the Medical-Vocational Guidelines ("the Grids") to determine that plaintiff was capable of performing other work existing in the national economy.  Considering Plaintiff's age, education, work experience and residual functional capacity, and based upon the medical and other evidence in the record, including the testimony of plaintiff, the ALJ's alternative determination that plaintiff has the ability to perform other jobs that exist in significant numbers in the national economy was supported by substantial evidence in the record.